**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NEW JERSEY CHINESE COMMUNITY CENTER, <br><br> Plaintiff, <br><br> v. <br><br> PETER MCALEER, *et al.*, <br><br> Defendants. | Civil Action No. 21-08320 (GC) (RLS) <br><br> **OPINION** |

**CASTNER, District Judge**

      **THIS MATTER** comes before the Court upon two Motions for Summary Judgment filed by Defendant Peter McAleer (ECF Nos. 96, 120) and Defendant Newsmatics (formerly IPD Group, Inc. doing business as EIN Presswire) (ECF No. 121) pursuant to Federal Rule of Civil Procedure (Rule) 56. Plaintiff New Jersey Chinese Community Center, Inc. opposed, and Defendants replied. (ECF Nos. 99-100, 122-125.) Also before the Court is Newsmatics's Motion for Sanctions pursuant to Rule 11 (ECF No. 103), which Plaintiff opposed (ECF No. 109). The Court has carefully considered the parties' submissions and held oral argument on March 18, 2025. For the reasons set forth below, and other good cause shown, McAleer's Motion for Summary Judgment is **GRANTED**. Newsmatics's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**. Newsmatics's Motion for Sanctions is **DENIED.**

# I.    BACKGROUND

## A.    Factual Background

### 1.    The Parties

Defendant Newsmatics is an internet-based platform that aggregates and categorizes online news content.  (ECF No. 121-3 ¶¶ 1-2.)  Newsmatics also provides press release distribution services through one of its companies, EIN Presswire.  (*Id.* ¶¶ 1, 4.)  Newsmatics and EIN Presswire do not publish their own content.  (*Id.* ¶ 3.)

Plaintiff is a not-for-profit organization led by Jimmy Hwang, its sole officer and director.  (*Id.* ¶ 56; ECF No. 122-1 at 6[1]; ECF No. 121-6 at 178-179, 43:11-44:13.)  In December 2020, Hwang purchased credits with Newsmatics allowing him to publish press releases through EIN Presswire.  (ECF No. 121-3 ¶ 42.)  According to Newsmatics's terms of service, EIN Presswire requires that press releases that are submitted for publication related to legal matters contain "a case number, court of record, complaint number or other sufficient documentation[.]"  (*Id.* ¶ 34.)  Further, Newsmatics's website states the following: "Third Party Legal Releases: EIN Presswire only accepts press releases from law firms in which the firm is representing one of the parties in the case.  EIN Presswire does not accept press releases regarding legal cases from third-party firms."  (*Id.* ¶ 35.)

### 2.    Plaintiff's Press Releases

On December 4, 2020, Hwang, on behalf of Plaintiff's "Legal Services Dept," submitted a press release to EIN Presswire that concerned landlord-tenant litigation in the Superior Court of New Jersey, Somerset County between Plaintiff and its former tenant.  (*See* ECF Nos. 123-3, 123-

---

[1]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

4.)  The December 4, 2020 press release titled, "In New Jersey Somerset Superior Court, Judge Thomas Miller Overrides How Other Judges Write Their Decisions," accused the judge presiding over the state court litigation of issuing a decision in favor of Plaintiff but then revising the judgment in favor of the opposing party after being improperly pressured by the assignment judge. (*See id.*)

Before the release was published, a client services representative from EIN Presswire emailed Hwang advising that although EIN Presswire generally "distribute[s] press releases with legal content," it would prefer to have Hwang's "law firm contact details" to "avoid having to perform complicated due-diligence or setting [itself] up for liability if the release is untrue." (ECF No. 123-5.)  Hwang responded by resubmitting the press release with an email address for what he claimed was Plaintiff's "legal department."  (*Id.*)  Hwang also stated that "[w]e are responsible for the news release that we published.  We only disclosed the facts and nothing else.  After all, whatever is published here is available in the public domain and there is nothing hidden."  (*Id.*)  Later that day, an EIN Presswire representative informed Hwang that his "press release ha[d] been approved and distributed."  (*Id.*)

On December 9, 2020, Hwang submitted a similar press release titled, "In New Jersey Somerset Superior Court, Nothing could stop Judge Miller from Meddling the [sic] Outcomes of a case," which was also subsequently published.  (*See* ECF Nos. 123-3, 123-4.)  Like the December 4 press release, the December 9 press release outlined Judge Miller's alleged "meddling" in Plaintiff's case.

On February 20, 2021, Hwang submitted for publication a third press release to EIN Presswire titled, "In New Jersey Somerset Superior Court, Judge Reed Just Couldn't Stand up to Judge Miller's Pressure in Deciding a Case."  (ECF No. 121-3 ¶ 43; ECF No. 121-6 at 339-41.)

Like the December 2020 press releases, the February 20 press release accused Judge Miller of pressuring Judge Reed to reverse a ruling that was previously favorable to Plaintiff. (ECF No. 121-6 at 339-341.) The content of the February 20 press release is similar to the December 2020 press releases but concludes by stating, "Judge Miller amasses so much power that he can do whatever he likes and nobody dares to touch him. It is judge[s] like him that ruins this country and makes New Jersey the state with the most corrupted justice system." (*Id.*) EIN Presswire approved the press release for distribution and published it that same day. (*See id.*; ECF No. 120-2 ¶ 10.)

### 3. *McAleer's Complaint*

On February 23, 2021, Peter McAleer, the Director of Communications and Community Relations for the New Jersey Administrative Office of the Courts, became aware of the February 20 press release. (*See* ECF No. 96-3 at 71, 25:11-26:19.) McAleer's communications manager, MaryAnn Spoto, forwarded the press release to McAleer in an email with the subject, "[t]his ran as a press release on Fox 40 website," which McAleer understood to be a news agency. (ECF No. 121-6 at 339-341; ECF No. 120-10 at 6, 18:13-20:5.) According to McAleer, he and Spoto are responsible for reviewing press releases and news articles written about the judiciary. (*See* ECF No. 96-3 at 68, 15:18-16:4.) McAleer testified in his deposition that in cases where inaccurate information is included in a press release, his office "would seek to have it corrected usually by calling the reporter involved." (*Id.* at 17:14-25.)

About three hours after receiving the press release at issue from Spoto, McAleer emailed a representative from Frankly Media, one of Newsmatics's third-party publishing partners. (ECF No. 121-6 at 33, 31:9-15; ECF No. 120-9 at 11-13.) McAleer found the representative's contact information at the bottom of the press release. (ECF No. 120-2 ¶ 38.) In his email to Frankly Media, McAleer asked, "Can someone please respond regarding this press release? Are

4

individuals able to pay to libel a judge?  We would ask that this be removed immediately."  (ECF No. 120-9 at 11-13.)  McAleer's email signature included his title as Director of the Office of Communications and Community Relations with the New Jersey Administrative Office of the Courts.  (*Id.*)  McAleer testified that his goal in sending the email to Frankly Media was "to make them aware of the fact that we didn't agree with what was being said" and that it was his "opinion that they should take it down."  (ECF No. 96-3 at 74, 37:6-11.)

At his deposition, McAleer was asked about his reaction upon reading the press release.  (*Id.* at 69, 19:19-21.)  McAleer testified that he was concerned that the press release issued by Plaintiff was attacking the judges' character and the reputation of the judiciary.  (*Id.* at 19:19-20:16.)  McAleer further testified that he was concerned that other news agencies would also begin reporting the story because it was on the Fox40 website.  (*Id.* at 19:22-20:5.)  In McAleer's opinion, the press release "just reeked of a disgruntled litigant that was trying to get even with" the judges referenced in the article.  (*Id.* at 30:11-12.)  Moreover, McAleer noted that there was no evidence provided in the press release to support Plaintiff's claims that the assignment judge improperly meddled in Plaintiff's case.  (*Id.* at 36:18-22.)

### 4.    *Retraction of the Press Release*

A Frankly Media representative forwarded McAleer's email to EIN Presswire's client services department, which forwarded the email chain to "editorial management."  (*Id.* at 98, 39:12-18.)  Two days later, on February 25, 2021, a member of EIN Presswire's client services department advised McAleer in an email that based on his "complaint," the "editorial department has retracted the press release from the site and forwarded the request to [EIN Presswire's] distribution partners."  (*Id.* at 52-53.)

On March 10, 2021, Hwang became aware that the February 20 press release had been retracted.  (ECF No. 122-1 at 5.)  On March 11, Hwang emailed EIN Presswire's client services

department to ask why the February 20 press release was retracted.  (ECF No. 122-7.)  Thereafter, Jeremy Fields, EIN Presswire's vice president for corporate development, emailed Hwang advising that the press release was "retracted with cause" based on a complaint filed by McAleer.  (*Id.*) Fields advised that in "matters such as these we act with caution and retract.  This is standard operating procedure to [ensure] transparency and neutrality in the face of possible litigation." (*Id.*)[2]

The parties dispute Newsmatics's basis for retracting the February 20 press release. According to Newsmatics, "[p]otential or threatened litigation had no role in Newsmatics's decision to retract the press release, nor was it aware of any specific threats."  (ECF No. 121-3 ¶ 11.)  Newsmatics retracted the press release because it should "never have been approved and distributed by Newsmatics because it is a legal press release and did not meet Newsmatics editorial guidelines and was released in error."  (ECF No. 121-3 ¶ 10.)  Plaintiff disputes this fact by noting that its prior press releases in December were approved and published in accordance with Newsmatics's editorial guidelines.  (ECF No. 122-2 ¶ 10.)  Fields testified in his deposition that because Newsmatics issues approximately 150,000 press releases per year, it does not independently verify the truthfulness of each release.  (ECF No. 121-6 at 63, 61:3-11.)  Rather, each press release undergoes an automated review to identify "dead links, banned content, [and] pornography."  (*Id.* at 21-22, 19:12-20:16.)  The automated review does not identify whether legal content is present in a particular press release nor does it perform any fact-checking.  (*Id.* at 94, 21:17-25.)  Moreover, Newsmatics's terms of service provide that it "may review content to

_____

[2]      On March 23, 2021, Plaintiff issued another press release titled, "Peter McAleer, Director of New Jersey Administrative Office of the Court suppressed News criticizing the courts."  (ECF No. 121-6 at 343.)  The press release is in the form of a draft complaint against McAleer alleging that McAleer violated Plaintiff's constitutional rights by suppressing Plaintiff's press release.  (*Id.*)

determine whether it is illegal or violates our policies, and we may remove or refuse to display content that we reasonably believe violates our policies or the law."  (ECF No. 121-3 ¶ 36.)

Fields further testified in his deposition that Newsmatics retracts press releases when it receives complaints from its publishing partners, like Frankly Media, in order to protect its distribution network and relationships.  (ECF No. 121-3 ¶ 13; ECF No. 121-6 at 33, 31:9-15.) According to Fields, Newsmatics seeks to prevent its publishing partners from receiving additional complaints about content on their network.  (ECF No. 121-6 at 63, 61:15-21.)  Fields explained in his deposition that "it's easier to simply remove content that draws attention and complaints." (ECF No. 121-6 at 64, 62:19-20.)  Thus, when Fields was asked whether Newsmatics had a choice in removing the press release in response to McAleer's complaint, Fields responded, "I feel like we obviously have a choice whether or not to take that complaint into consideration.  But our standard operating procedure is to remove a press release once we receive a complaint from a third-party publisher or anyone in general."  (ECF No. 121-6 at 91-92, 89:18-90:4.)

When Fields was asked at his deposition about what he was referring to when he cited "possible litigation" as a basis for retracting the press release, the following exchange occurred:

> Q. When you said "possible litigation" in your March 16th E-mail, did the possible litigation only refer to things that were said in Jimmy Hwang's press release?
>
> A. Yes.
>
> Q. So you're saying the possible litigation did not refer to litigation against Newsmatics at all; correct?
>
> A. Correct.
>
> Q. Okay. What -- where in the press release does it discuss the possible litigation you're talking about?
>
> A. The press release in question is talking about a judge in the New Jersey Somerset Superior Court, an ongoing deciding case. . . .

. . .

> Q. So aren't you saying -- you said "possible litigation" because Jimmy Hwang's press release talked about possible litigation?
>
> A. Correct.
>
> [(ECF No. 121-6 at 68-69, 66:19-67:9; *id.* at 71, 69:20-23.)]

Fields also denied that he was concerned about being sued by any of the involved parties:

> Q. Mr. Fields, were you concerned about being sued by Peter McAleer?
>
> A. No.
>
> Q. Were you concerned about being sued by the Community Center?
>
> A. I'm sorry. Which Community Center?
>
> Q. The New Jersey Chinese Community Center.
>
> A. No.
>
> Q. Were you concerned about being sued by Judge Miller?
>
> A. No.
>
> Q. Were you concerned about being sued by Judge Reed?
>
> A. No.
>
> Q. Were you concerned about being sued by anyone for publishing the press release?
>
> A. No.
>
> [(ECF No. 121-6 at 51-52, 49:11-50:3.)]

Finally, when Fields was asked "[a]t any point in time did you feel that Peter McAleer threatened Newsmatics with any litigation?" he responded "[n]o. Not at all." (*Id.* at 84, 82:20-23.)

Plaintiff rebuts Fields's testimony by arguing that "Defendant Newsmatics retracted the press release due to its concern of possible litigation for libel," citing the March 16 email from Fields to Plaintiff. (ECF No. 122-2 ¶ 9.)  In its opposition brief, Plaintiff also argues that (1)

Fields's testimony regarding how McAleer's email was received by Newsmatics was "not relevant to the legal analysis," and (2) it is "in Newsmatics self-interest to deny that it felt threatened to avoid being deemed the actor and subject to liability." (ECF No. 99 at 23.)

### B.    Procedural History

On April 6, 2021, Plaintiff filed its initial Complaint seeking damages and injunctive relief against Newsmatics, McAleer, and the State of New Jersey for alleged violations of its rights to freedom of speech under the First and Fifth Amendments to the United States Constitution pursuant to 42 U.S.C. §§ 1983-1986,[3] the New Jersey State Constitution, and the New Jersey Civil Rights Act (NJCRA). (ECF No. 1.) Newsmatics filed a Motion to Dismiss, which the Court granted on May 17, 2022, for Plaintiff's failure to allege state action on the part of Newsmatics. (*See* ECF No. 25.) The Court dismissed all claims against Newsmatics without prejudice and afforded Plaintiff thirty days to amend its pleadings. (*Id.*)

On June 9, 2022, Plaintiff filed the First Amended Complaint (FAC), which asserted the same causes of action but supplemented its factual allegations as to McAleer. (*See* ECF No. 27.) Defendants moved to dismiss. (ECF Nos. 22, 28.) On August 15, 2022, the Court dismissed all claims against the State of New Jersey with prejudice under Eleventh Amendment sovereign immunity and because the State is not a "person" amenable to suit under §§ 1983 to 1986. (ECF No. 34 at 9-14.). The Court dismissed Plaintiff's §§ 1985 and 1986 claims against McAleer without prejudice because Plaintiff did not allege a racially motivated conspiracy. (*Id.* at 24.) The Court directed the parties to submit additional briefing on the issue of whether Plaintiff stated a claim for state suppression of speech under § 1983 and the NJCRA. (*Id.* at 5.)

---

[3]    The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

On December 2, 2022, the Court denied McAleer's and Newsmatics's Motions to Dismiss and allowed Plaintiff's § 1983 and NJCRA claims to proceed.  (ECF No. 42.)  The Court held that at the motion-to-dismiss stage, Plaintiff had sufficiently pled a suppression of speech claim as well as state action on the part of Newsmatics.  (*Id.*)  On August 17, 2023, the matter was reassigned to the undersigned.  (ECF No. 81.)

The parties proceeded to discovery.  On August 16, 2023, the Magistrate Judge extended "the deadline for any motion to amend the pleadings . . . through November 17, 2023."  (ECF No. 80.)  On November 17, 2023, Newsmatics moved to amend its Answer to the FAC to (1) include an affirmative defense of immunity from suit under 47 U.S.C. § 230, and (2) add two counterclaims against Plaintiff for breach of contract and indemnification.  (ECF No. 86-6.)  On December 3, 2023, Plaintiff brought a "cross-motion" for leave to file a second amended complaint (SAC) "to add a breach of contract cause of action against Defendant Newsmatics."  (ECF No. 88 at 5.)

On April 16, 2024, while Plaintiff's and Newsmatics's motions to amend the pleadings were still pending, McAleer and Newsmatics moved for summary judgment (ECF Nos. 95, 96) in accordance with the Court's Pretrial Scheduling Order deadlines (ECF Nos. 62, 92).

On June 4, 2024, the Magistrate Judge granted both Plaintiff's and Newsmatics's unopposed Motions to Amend and directed the parties to file their amended pleadings by June 10, 2024.  (ECF No. 105.)

On June 10, 2024, Plaintiff and Newsmatics filed their amended pleadings.  Both pleadings contained additional causes of action that were not included in their Motions to Amend, their proposed pleadings, or the Magistrate Judge's June 4, 2024 Order.  Specifically, Plaintiff filed a pleading styled as the "Third Amended Complaint" (TAC) seeking damages and injunctive relief against Newsmatics and McAleer for alleged violations of its rights to freedom of speech under

the First and Fifth Amendments pursuant to 42 U.S.C. §§ 1983-1986, the New Jersey State Constitution, and the NJCRA (Count I); breach of contract against Newsmatics (Count II); and tortious interference with a contract against McAleer (Count III). (ECF No. 108 ¶¶ 54-70.) Newsmatics's Amended Answer included a third counterclaim for common law fraud against Plaintiff. (ECF No. 115.)

On June 28, 2024, in light of the amended pleadings, the Court administratively terminated Newsmatics's and McAleer's previous motions for summary judgment and permitted the parties to supplement their motions. (ECF No. 119.)

McAleer seeks summary judgment on Plaintiff's claims under sovereign immunity and qualified immunity. (ECF No. 96.) In his supplemental Motion for Summary Judgment filed on July 29, 2024, McAleer moves to dismiss the TAC in its entirety due to Plaintiff's failure to seek leave of Court before adding its claim for tortious interference against McAleer. (ECF No. 120.) Alternatively, McAleer asks the Court to strike Plaintiff's claim for tortious interference from the TAC. (ECF No. 120-1 at 8.) Plaintiff opposed, and McAleer replied. (ECF Nos. 123, 124.)

On July 29, 2024, Newsmatics filed what it styled as a "revised" Motion for Summary Judgment, seeking summary judgment on all of Plaintiff's claims against it as well as Newsmatics's three counterclaims against Plaintiff. (ECF No. 121.) Plaintiff opposed, and Newsmatics replied. (ECF Nos. 122, 125.) Newsmatics also filed a Motion for Sanctions against Plaintiff pursuant to Rule 11. Plaintiff opposed the Motion. (ECF No. 109.) Newsmatics argues that Rule 11 sanctions are appropriate for two reasons: (1) Plaintiff maintained this suit even though Newsmatics is immune from liability under the Communications Decency Act, 47 U.S.C. § 230; and (2) Plaintiff lacked a factual basis to bring its claims against Newsmatics.

## II.   <u>LEGAL STANDARD</u>

### A.   **Summary Judgment**

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  *In re Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011).  Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)).  "A fact is material if—taken as true—it would affect the outcome of the case under governing law." *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "And a factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

### B.   **Motion to Strike**

Rule 12 allows the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  "Because of the drastic nature of the remedy, however, motions to strike are usually 'viewed with disfavor' and will generally 'be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues.'" *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 609 (D.N.J. 2002) (quoting *Tonka Corp. v. Rose Art. Indus., Inc.*, 836 F. Supp. 200, 217 (D.N.J. 1993)).  "In deciding the present motion, the Court must also bear in mind that generally, 'motions to strike under Rule 12(f) are highly disfavored.'" *Newborn Bros. Co., Inc. v. Albion Eng'g Co.*, 299 F.R.D. 90, 94 (D.N.J. 2014) (quoting *FTC v. Hope Now Modifications, LLC*, Civ. No. 09-1204, 2011 WL 883202, at *1 (D.N.J. Mar. 10, 2011)).  Although "a motion to strike is 'generally viewed with disfavor and should b[e] used sparingly,' . . . use of

12

Rule 12(f) is appropriate [when] to hold otherwise would be to essentially ignore [Rule] 15(a) and the requirement that a plaintiff seek leave before amending its complaint." *U.F.C.W. Loc. 56 Health & Welfare Fund v. J.D.'s Mkt.*, 240 F.R.D. 149, 154 (D.N.J. 2007) (internal citation omitted).

## III.   DISCUSSION

### A.   Motions to Strike

McAleer argues that the entire TAC, or alternatively, Count III of the TAC, must be dismissed because Plaintiff was never granted leave to add a claim for tortious interference against McAleer.[4]  (ECF No. 120-1.)  Similarly, Plaintiff moves to dismiss Newsmatics's counterclaim for common law fraud on the same grounds.  (ECF No. 122 at 17.)  For the reasons set forth below, the Court will strike Plaintiff's Count III from the TAC as well as Newsmatics's counterclaim for common law fraud pursuant to Rules 12(f), 15(a) and 16(b)(4).

Under Rule 15(a), after responsive pleadings have been filed, parties may amend their pleadings only with the opposing parties' written consent or the Court's leave, neither of which the parties obtained before bringing these additional claims.  Plaintiff's Motion to Amend sought to "add a breach of contract cause of action against Defendant Newsmatics," and Plaintiff's proposed amended pleading did not include a claim for tortious interference.  (ECF No. 88 at 5; ECF No. 88-1.)  On June 4, 2024, the Magistrate Judge granted Plaintiff's Motion "to add a claim for breach-of-contract against Newsmatics."  (ECF No. 105 at 2.)  The claim for tortious interference in Plaintiff's TAC therefore exceeds the scope of the amendments permitted by the Magistrate Judge.

---

[4]    McAleer seeks dismissal of the TAC under Rule 56, and Plaintiff argues in its opposition brief that Newsmatics's counterclaim should be dismissed.  The Court construes these as requests to strike under Rule 12(f).  Regardless, the Court may strike offending pleadings *sua sponte*. *See* Fed. R. Civ. P. 12(f)(1).

Similarly, Newsmatics's Motion to Amend sought to add an affirmative defense and "two counterclaims," and its proposed amended pleading asserted only two counterclaims for breach of contract and indemnification. (ECF No. 86-2 ¶ 15; ECF No. 86-6.) The Magistrate Judge granted Newsmatics's motion "to add an affirmative defense and two counterclaims against [Plaintiff] for indemnification and breach of Newsmatics' guidelines, terms of use, and user agreement." (ECF No. 105 at 1.) Therefore, Newsmatics's counterclaim for common law fraud in its Third Amended Answer to the TAC exceeds the scope of the amendments permitted by the Magistrate Judge.

A party seeking to amend its pleadings after the deadline set in the Court's Pretrial Scheduling Order must satisfy the good cause standard pursuant to Rule 16(b)(4) before the Court considers whether the party meets the less stringent Rule 15(a) standard for amendment. *See Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 84 (3d Cir. 2010); *Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 319 (3d Cir. 2020). To demonstrate good cause, the party must show that it exercised due diligence, which can be met if the "delay in filing the motion to amend stemmed from any mistake, excusable neglect, or any other factor which might understandably account for failure of counsel to undertake to comply with the Scheduling Order." *Young v. United States*, 152 F. Supp. 3d 337, 353 (D.N.J. 2015) (citation and internal quotation marks omitted). If the party possessed, or should have possessed through reasonable diligence, the knowledge necessary to seek leave to amend before the deadline lapsed, courts typically find that the party lacked due diligence and will deny leave to amend. *See Fermin v. Toyota Material Handling, U.S.A., Inc.*, Civ. No. 10-3755, 2012 WL 1393074, at *3 (D.N.J. Apr. 23, 2012).

Here, neither Plaintiff nor Newsmatics have established good cause to permit the amendments that exceed the scope of the Magistrate Judge's June 4, 2024 Order and were filed well beyond the Pretrial Scheduling Order deadline of November 17, 2023.

14

Plaintiff asserts that its claim for tortious interference against McAleer was filed late only because Newsmatics at the "eleventh hour" sought to add a breach of contract counterclaim against Plaintiff. (ECF No. 123 at 5-6.) But Plaintiff made this same argument in its Motion to Amend where it sought to add the additional breach of contract claim against Newsmatics but chose not to raise the tortious interference claim against McAleer. (ECF No. 88.) Plaintiff provides no explanation for why it did not seek leave to add the tortious interference claim against McAleer together with the breach of contract claim in its Motion to Amend, or any other time before filing the TAC. Plaintiff points to a joint status letter dated December 11, 2023, in which it asked the Court for an additional thirty days to "assert any claims related to or in response [to] [D]efendants' newly asserted counterclaims." (ECF No. 90 at 4.) But Plaintiff made no indication that it intended to bring a tortious interference claim against McAleer nor took any further action related to the letter. Simply put, Plaintiff never sought and was never granted leave to add a claim for tortious interference against McAleer.

Plaintiff also attempts to argue that McAleer should have been on notice of the potential tortious interference claim as early as April 6, 2021. (ECF No. 123 at 9.) If that is true, then Plaintiff too must have "possessed, or through the exercise of reasonable diligence should have possessed, the knowledge necessary" to timely assert the claim. *See Fermin*, 2012 WL 1393074, at *3. Plaintiff has not explained why Newsmatics's timely Motion to add a breach of contract counterclaim on November 17, 2023, excused Plaintiff from asserting a claim for tortious interference against McAleer.

Similarly, Newsmatics has not attempted to identify in any of its filings "any mistake, excusable neglect, or any other factor which might understandably account for" its failure to seek leave to add the counterclaim for fraud. *Young*, 152 F. Supp. 3d at 353. For these reasons, the

Court finds that neither Plaintiff nor Newsmatics has established good cause to amend their pleadings in a manner exceeding the scope of the Magistrate Judge's June 4, 2024 Order and the deadlines set forth in the Court's Pretrial Scheduling Order (ECF Nos. 62, 92). *See also Harrison Beverage Co. v. Dribeck Imps.*, 133 F.R.D. 463, 469 (D.N.J. 1990) ("The careful scheme of reasonable framing and enforcement of scheduling orders for case management would thus be nullified if a party could inject amended pleadings upon a showing of less than good cause after scheduling deadlines have expired.").

Where an amended pleading exceeds the scope of the amendments that were previously allowed by a court, district courts in this Circuit either (1) dismiss the pleading in its entirety, or (2) strike the portions of the amended pleading that exceed the scope of the permitted amendments under Rule 12(f). *See U.F.C.W. Local 56 Health and Welfare Fund*, 240 F.R.D. at 154 (comparing decisions dismissing entire pleadings "that substantially differed from the proposed" pleadings, with other decisions holding that "the failure to seek the required leave of court when adding a new allegation is grounds for striking that allegation" (citations omitted)). Here, both Plaintiff's TAC and Newsmatics's Third Amended Answer to the TAC are largely identical to the proposed pleadings approved by the Magistrate Judge except for the new causes of action that were not previously approved by the Court. Therefore, the Court finds it appropriate to strike these additional claims rather than dismiss the pleadings in their entirety. *See id.* (noting that although motions to strike "should b[e] used sparingly," use of Rule 12(f) is appropriate where "to hold otherwise would be to essentially ignore [Rule 15(a)] and the requirement that a plaintiff seek leave before amending its complaint"); *see also T.J. McDermott Transportation Co. v. Cummins, Inc.*, Civ. No. 14-4209, 2017 WL 11476192, at *2 (D.N.J. Jan. 17, 2017) ("Where an amendment has been made impermissibly without leave of the court, Rule 12(f) is the correct instrument with

which to correct the complaint"). Pursuant to Rules 15(a) and 12(f), the Court strikes Count III of

the TAC for tortious interference against McAleer (ECF No. 108 ¶¶ 64-70), and Newsmatics's

counterclaim against Plaintiff for common law fraud. (ECF No. 115 at 22-23 ¶¶ 43-50).

**B.    McAleer's Motion for Summary Judgment on Plaintiff's First Amendment Claim under § 1983 and the NJCRA (Count One)[5]**

McAleer argues that the doctrine of qualified immunity entitles him to summary judgment

on Plaintiff's First Amendment claim.[6] McAleer contends that in requesting that the press release

be removed, he did not violate any clearly established constitutional right of Plaintiff's because

Newsmatics's decision to retract the press release was not the result of impermissible government

coercion. (*See* ECF No. 96-1 at 8-9.)

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231

(2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When properly applied,

[qualified immunity] protects all but the plainly incompetent or those who knowingly violate the

law." *Schneyder v. Smith*, 653 F.3d 313, 331 (3d Cir. 2011) (internal quotation marks and citations

omitted). Moreover, "[q]ualified immunity balances two important interests—the need to hold

public officials accountable when they exercise power irresponsibly and the need to shield officials

---

[5]     "The NJCRA was modeled after § 1983, and courts in New Jersey have consistently looked at claims under the NJCRA 'through the lens of § 1983[.]'" *Wronko v. Howell Twp.*, Civ. No. 3:17-CV-1956, 2018 WL 516055, at *6 (D.N.J. Jan. 23, 2018) (internal quotation marks omitted). Accordingly, the Court analyzes Plaintiff's § 1983 and NJCRA claims together.

[6]     Plaintiff's TAC also asserts a freedom of speech claim under the Fifth Amendment. But as the Court has previously held, "the right to freedom of speech does not arise under the Fifth Amendment." (ECF No. 34 at 16 n.6.) Thus, the Court construes Plaintiff as asserting only a First Amendment claim. To the extent that Plaintiff asserts a Fifth Amendment claim, that claim is dismissed with prejudice.

from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. "[T]he party asserting the affirmative defense of qualified immunity" bears the burden of persuasion at the summary judgment stage. *Halsey v. Pfeiffer*, 750 F.3d 273, 288 (3d Cir. 2014).

Courts apply a two-prong test for determining whether qualified immunity applies at the summary judgment stage: "the first prong being whether the facts, as viewed in the light most favorable to the plaintiff, show the violation of a legal right, and the second being whether that right was clearly established." *Mack v. Yost*, 63 F.4th 211, 227 (3d Cir. 2023) (citing *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021)). Courts may analyze these prongs in either order. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). The Court addresses each prong below.

### 1.    *Clearly Established Right*

The Court remains satisfied that Plaintiff has identified a clearly established right. Under this prong, courts must proceed in two steps: first, courts must "define the right allegedly violated at the appropriate level of specificity" and then "ask whether that right was 'clearly established' at the time of its alleged violation." *Mack*, 63 F.4th at 228. In deciding whether a right is clearly established, courts in the Third Circuit "look first for applicable Supreme Court precedent. If none exists, [courts] consider whether there is a case of controlling authority in [the Third Circuit] or a robust consensus of cases of persuasive authority in the Courts of Appeals." *See Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 449 (3d Cir. 2020) (quoting *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017)).

At the motion-to-dismiss stage, the Court found that McAleer defined the right at issue "far too narrowly" and directed him to redefine it. (ECF No. 34 at 22.) Subsequently, in its December 2, 2022 Letter Order, the Court rejected McAleer's re-framing, holding that Supreme Court and Third Circuit precedent clearly established the First Amendment right "to be free from adverse

actions taken by third parties as a result of threat or coercion by state actors." (ECF No. 42 at 6 n.2 (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963), *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85 (3d Cir. 1984), and *Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983)). In so holding, the Court allowed the matter to proceed to discovery to determine whether McAleer's actions violated that well established right. (*Id.*)

In his Motion for Summary Judgment, McAleer again argues that Plaintiff has not identified a clearly established right. Specifically, McAleer writes that "there is no controlling law or robust consen[s]us of persuasive authority finding a violation of the First Amendment when a request to remove a press release is lodged to a third party distributor, particularly where . . . the request to retract the [p]ress [r]elease was not coercive and included neither implicit nor explicit threats of action if not retracted." (ECF No. 96-1 at 31.) But McAleer's argument fails for at least two reasons.

First, as McAleer did at the motion-to-dismiss stage, he defines the constitutional right at issue far too narrowly. (*See* ECF No. 34 at 21 ("More problematically, Mr. McAleer defines the right at issue far too narrowly. At bottom, this is a case of alleged interference with speech critical of a state judge for allegedly failing to remain impartial.").) *See Bradley v. W. Chester Univ. of Pa. State Sys. of Higher Educ.*, 226 F. Supp. 3d 435, 449 (E.D. Pa. 2017) ("[T]he Supreme Court has been clear that 'a case directly on point' is not required to render a right 'clearly established' and that instead, 'existing precedent must have placed the . . . constitutional question beyond debate.'" (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011))); *see also Foster v. Twp. of Pennsauken*, Civ. No. 16-5117, 2018 WL 3742621, at *26 (D.N.J. Aug. 7, 2018) ("[I]t would be unduly narrow to frame the answer to the question of which right needed to have been 'clearly established' as 'the right to advocate for a twelve-hour shift.'"). Thus, the Court will not depart

from its earlier ruling that Plaintiff has a clearly established First Amendment right to be free from adverse actions taken by third parties because of threat or coercion by state actors.

Second, McAleer appears to conflate the two prongs of the qualified immunity analysis; his proposed framing does not address *Plaintiff's* clearly established right (*i.e.*, to publish critical commentary about public officials without suffering adverse action based on state coercion), but rather frames the right based on whether McAleer violated it. *See Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 n.6 (5th Cir. 2018) ("Granting of qualified immunity on the 'clearly-established' prong is not the same as holding that no constitutional violation occurred. That would conflate the two prongs of qualified immunity.").

Accordingly, the Court finds that Plaintiff has identified a clearly established right under the First Amendment to be free from adverse actions taken by third parties as a result of threat or coercion by state actors. The Court next turns to the issue of whether McAleer violated that right.

### 2.    *First Amendment Violation*

In denying McAleer's Motion to Dismiss, the Court reserved judgment on whether McAleer violated a legal right that would prohibit qualified immunity. (ECF No. 42 at 6.) The Court accepted as true Plaintiff's allegation that McAleer made a "threat" to have the press release retracted, and it considered the email from EIN Presswire to Plaintiff in which EIN Presswire acknowledged that the press release was "retracted with cause" following a complaint from McAleer. However, the substance of McAleer's complaint was not before the Court. (*See id.* at 5-7.) Although the Court allowed the matter to proceed, it cautioned Plaintiff that it would be unlikely to survive summary judgment unless discovery revealed "further correspondence or other evidence supporting Plaintiff's contention that Mr. McAleer *coerced* EIN Presswire to retract the press release through the threat of potential litigation." (*Id.* at 6 n.2 (emphasis added).)

Indeed, "[a] government official cannot coerce a private party to punish or suppress disfavored speech on h[is] behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). However, in situations where "a public official is sued for allegedly causing a third party to take some type of adverse action against [a] plaintiff's speech," the United States Court of Appeals for the Third Circuit has held that a "defendant's conduct must be of a particularly virulent character." *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001). Thus, "[i]t is not enough that [a] defendant speaks critically of [a] plaintiff or even that [the] defendant directly urges or influences the third party to take adverse action. Rather, [a] defendant must 'threaten' or 'coerce' the third party to act." *Id.*

The Supreme Court recently reaffirmed that "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Vullo*, 602 U.S. at 180 (citing *Bantam Books*, 372 U.S. at 67). Accordingly, Plaintiff's First Amendment claim turns on whether McAleer "threatened" or "coerced" Newsmatics into retracting the February 20 press release. Based on the totality of the circumstances, the Court finds that he did not.[7] Even when the evidence is viewed in the light most favorable to Plaintiff, the Court finds

---

[7]    The Supreme Court recently observed that several Circuits have employed "fact-intensive approaches" and a "multifactor test or a totality-of-the-circumstances analysis" to determine whether a government official improperly "coerced" a private party to suppress a plaintiff's speech. *See Vullo*, 602 U.S. at 189 (recognizing that the Third Circuit has taken a totality-of-the-circumstances approach). For example, the Second Circuit has considered: "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and . . . , (4) whether the speech refers to adverse consequences." *Id.* at 189-90     The Court, however, cautioned that these factors are "just helpful guideposts in answering the question whether an official seeks to persuade or, instead, to coerce." *Id.* at 191. In this case, the Court follows *R.C. Maxwell's* totality-of the-circumstances approach. *See id.* at 190. But for the avoidance of doubt, the Court would reach the same conclusion if it analyzed Plaintiff's claim under the factors referenced in *Vullo*.

that McAleer's actions were not "particularly virulent" or coercive, and therefore McAleer is entitled to qualified immunity.

Plaintiff argues that the Supreme Court's decision in *Bantam Books, Inc. v. Sullivan* should lead this Court to deny McAleer's Motion. 372 U.S. 58. *Bantam Books* involved a commission, created by the Rhode Island Legislature, which was responsible for reviewing printed materials containing obscene language and recommending the prosecution of violations of the state's laws. *Id.* at 59. To that end, the commission provided publishers lists of objectionable books and magazines and served notices threatening criminal action against vendors who circulated those publications. *Id.* at 62. These notices declared certain publications "completely objectionable" for sale, distribution, or display for youths, and reminded recipients of the commission's duty to recommend to the attorney general the prosecution of purveyors of obscenity. *Id.* at 62 n.5. Further, the notices stated that the "Chiefs of Police" had received the names of the objectionable publications and warned that the attorney general would "act" for the commission in the case of "non-compliance." *Id.* The commission also sent police officers to follow-up with some of the recipients. *Id.* at 63.

The publishers sued the commission for violating their First Amendment rights. *Id.* at 59-61. The Supreme Court held that the system was unconstitutional and amounted to state sponsored censorship. *Id.* at 72. Specifically, the Court noted that despite lacking the authority to regulate or suppress content, the commission had done so through "the threat of invoking legal sanctions and other means of coercion, persuasion and intimidation" to suppress "objectionable" publications. *Id.* at 66-67. The Court further found that compliance with the commission's directives was "not voluntary" since "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them." *Id.* at 68. In summation, the Court

22

highlighted that the commission operated a "scheme of state censorship effectuated by extralegal sanctions; they acted as an agency not to advise but to suppress." *Id.* at 72.

In support of summary judgment, McAleer relies on *R.C. Maxwell Co. v. Borough of New Hope*, a First Amendment case where the Third Circuit distinguished the facts before it from those in *Bantam Books*. 735 F.2d 85 (3d Cir. 1984). *R.C. Maxwell* involved a plaintiff who leased commercial billboards from Citibank in the Borough of New Hope, Pennsylvania for purposes of advertising alcoholic products. *Id.* at 86. New Hope's Council disapproved of the billboards as inconsistent with the ambience of the community. *Id*. at 86. The Council sent a letter to Citibank seeking its "personal assistance" in removing the billboards, and it further stated that it hoped Citibank would do so by professional agreement rather than through more costly "legal procedures." *Id.* at 86 n.2. Although the letter indicated that this was a "courteous request," it also noted that the Borough was considering a new zoning ordinance that would prohibit such advertising and that a federal agency might also soon require the billboards to be removed. *Id.*

Citibank thereafter removed the billboards out of concern for its reputation in the community and its desire to stay in the "good graces" of the Council. *Id*. at 87. The plaintiff sued New Hope, arguing under *Bantam Books* that New Hope had "coerced" Citibank into removing the billboards in violation of the plaintiff's First Amendment rights. *Id*. The district court granted summary judgment in favor of New Hope, and the Third Circuit affirmed. *Id*. Focusing on the communications between New Hope and Citibank, the Court explained that unlike the notices in *Bantam Books*, New Hope's letters were "devoid" of "any enforceable threats," since the Borough Council could brandish nothing more serious than civil or administrative proceedings under a zoning ordinance not yet drafted. *Id*. at 88-89. In other words, the Court did not "believe that

New Hope's communications with Citibank [could have been] read to have 'coerced' Citibank." *Id*. at 88.

In affirming the district court's grant of summary judgment, the Court explained that the district court's decision was "amply supported by the deposition testimony of Alan Rosenstein, the Citibank vice-president who dealt with the Borough Council and who ordered the billboards removed." *Id.* at 88-89. The Court drew a sharp distinction between the case before it and *Bantam Books*. Specifically, the Court reasoned that "[i]n marked contrast to the book distributor who testified in *Bantam Books*, Rosenstein stated that his decision to remove the billboards, while prompted by the Borough Council's letters, was entirely voluntary" and further highlighted that "Rosenstein denied having felt coerced or intimidated by the Council's actions." *Id.* at 89. The Court also rejected the plaintiff's contention that the coercion "was of a subtler variety than in *Bantam Books*," and declined to attach constitutional significance to testimony that Citibank removed the billboard in part to "secure the good graces of the Borough Council." *Id.*

Based on the totality of the circumstances, the Court agrees with McAleer that based on the Third Circuit's ruling in *R.C. Maxwell* summary judgment should be granted in his favor. The Court finds the facts here are more akin to those in *R.C. Maxwell*, which supports a finding that McAleer's email requesting that the February 20 press release be "removed immediately" does not rise to the level of state-coerced action. At most, McAleer's email, like the Borough's letters in *R.C. Maxwell* "brandished nothing more serious than civil or administrative proceedings." *R.C. Maxwell*, 735 F.2d at 88. McAleer's email is "devoid" of "any enforceable threats," as he lacked any regulatory or enforcement power. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972) (collecting cases where courts found First Amendment violations based on chilled speech, and noting that "in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or

24

compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging"). Even construing McAleer's email in the light most favorable to Plaintiff, McAleer's email does not rise to the level of governmental authority that was brought to bear against the Rhode Island booksellers in *Bantom Books*. As the Third Circuit in *R.C. Maxwell* noted, the commission in *Bantom Books* threatened criminal prosecution and "punctuated its letters with personal visits from uniformed police officers." *R.C. Maxwell*, 735 F.2d at 88.

Moreover, the recipient of the communication in this case, like in *R.C. Maxwell*, testified that its decision to remove the February 20 press release was not the result of government coercion or intimidation. Newsmatics's vice president for corporate development, Jeremy Fields, testified that it was the company's policy to retract press releases upon receiving complaints from publishers. (ECF No. 121-3 ¶ 6.) Following the publication of the February 20 press release, Newsmatics received a complaint from its publishing partner Frankly Media, the entity listed on the press release. (*Id.* ¶ 8.) In his email to Hwang, Fields stated that the press release had been retracted following McAleer's complaint and noted that "[i]n matters such as these we act with caution and retract. This is standard operating procedure to insure transparency and neutrality in the face of possible litigation." (ECF No. 122-1 ¶ 29.) In his sworn testimony, Fields confirmed that he was referring to litigation in general, not litigation from the judges at issue or the judiciary. (ECF No. 125-1 ¶ 9.) Fields also explained the rationale behind the retraction policy, which is to protect Newsmatics's network of third-party publishers from receiving complaints. (ECF No. 121-6 at 63, 61:15-21.) In any event, Fields made clear that he did not fear a lawsuit from McAleer, the judges involved, or anyone else. (ECF No. 121-6 at 51-52, 49:11-50:3.)

Plaintiff challenges Fields's testimony based on Plaintiff's December 2020 press releases that were approved and published.  However, the Court finds this fact reaffirms Field's testimony.  All of Plaintiff's press releases, other than the February 20 press release, are still available on EIN Presswire.  (*See* ECF No. 96-3 at 74, 40:7-13.)  *See also* EIN Presswire, *NJ Chinese Community Center Press Releases*, https://www.einpresswire.com/sources/u429593 (last visited May 22, 2025).  Instead of retracting Plaintiff's other press releases in fear of potential litigation, Newsmatics relied on its policy and retracted only the press release about which McAleer complained to its publisher.  Plaintiff contends that "[i]t is irrelevant what Newsmatics' 'long-standing business policy' . . . is or what it does with other press releases that generate a complaint.  The issue is why the press release in this particular case was retracted." (ECF No. 122 at 16-17 (internal citation omitted).)  But the Court finds that Newsmatics's standard operating procedure, as described by Fields, is relevant.  That policy, combined with Fields's testimony that he did not perceive a threat of litigation against Newsmatics by the judges or the judiciary, weighs in favor of granting summary judgment.  Although Plaintiff argues that Fields's reaction to receiving McAleer's email is irrelevant to the legal analysis and self-serving, (*see* ECF No. 99 at 23), these arguments are unavailing in light of *R.C. Maxwell*, where the court relied on the testimony of the recipient of the Borough Council's letters in granting summary judgment.  735 F.2d at 88-89.[8]  As binding authority, the Court finds that *R.C. Maxwell* instructs it to grant summary judgment in favor of McAleer.

---

[8]    The Court reads *R.C. Maxwell* as requiring the Court to weigh the factual record and make a determination as to coercion as opposed to the jury.  *See* 735 F.2d at 89.

The Ninth Circuit's opinion in *Kennedy v. Warren* is also instructive on the issue of coercion.  That case was brought by publishers of a book about COVID-19, who argued that a United States Senator violated their First Amendment rights by sending a letter to Amazon requesting that Amazon modify its algorithms to no longer direct its customers to the plaintiffs' book.  66 F.4th at 1204.  The district court denied the plaintiffs' motion for a preliminary injunction and the Ninth Circuit affirmed, concluding that the Senator's letter fell "safely on the persuasion side of the line," as opposed to the coercive one.  *Id.*  In pertinent part, the Senator's letter to Amazon read as follows:

> I write regarding concerns that Amazon is peddling misinformation about COVID-19 vaccines and treatments through its search and "Best Seller" algorithms.  This is the second time in six months that I have identified Amazon practices that mislead consumers about COVID-19 prevention or treatment: earlier this year, I wrote regarding concerns that the company is providing consumers with false and misleading information about FDA-authorized KN95 masks.  This pattern and practice of misbehavior suggests that Amazon is either unwilling or unable to modify its business practices to prevent the spread of falsehoods or the sale of inappropriate products—an unethical, unacceptable, and potentially unlawful course of action from one of the nation's largest retailers.

*Id.* at 1204.

Like Plaintiff does here, the plaintiffs in *Kennedy* attempted to analogize their case to *Bantam Books.  Id.* at 1207.  In rejecting that argument, the Ninth Circuit reasoned that the Senator "never hinted that she would take specific action to investigate or prosecute Amazon."  *Id.* at 1212. The plaintiffs advanced the theory that the Senator's reference to Amazon's actions being "potentially unlawful" constituted an impermissible threat, but the court squarely rejected that reading as "requir[ing] a vivid imagination."  *Id.*  The court also reasoned that "not every official's legal opinion reasonably resembles a threat."  *Id.* at 1209 ("For example, it would not be coercive

for a government official to point out that a company's conduct could be the basis of a consumer class action.").

As in *Kennedy*, there is no evidence in the record that McAleer made any specific threat to investigate or prosecute Newsmatics if it did not retract the press release. *Id.* at 1212; *see also Hammerhead Enterprises, Inc.*, 707 F.2d at 37-39 (finding no coercion where a government official sent a letter urging department stores not to carry an offensive board game because the government official "took no further steps to trace the consequences of his correspondence . . .[,] did not investigate whether any merchants were in fact carrying the game," and did not "contact any government agency which might have regulatory authority over [the] department stores").

While the Court does not condone McAleer's actions, the Court finds that McAleer's reference to a possible libel case against Newsmatics is insufficient alone to establish coercion. *See Kennedy*, 66 F.4th at 1209 ("[R]eferencing potential legal liability does not morph an effort to persuade into an attempt to coerce."); *Riley v. Lusk*, Civ. No. 19-00335, 2019 WL 3412259, at *10 (M.D. Pa. July 29, 2019) ("It is clear, then, that some form of coercion is required to establish a Constitutional violation for attempting to influence a third party to retaliate. *Even threat of litigation is not sufficiently coercive.*" (emphasis added) (citing *R.C. Maxwell Co.*, 735 F.2d 85)). And the tone of McAleer's email does not surpass that of the letter in *Kennedy*. 66 F.4th at 1204 (stating that Amazon's "pattern and practice of misbehavior suggests that Amazon is either unwilling or unable to modify its business practices to prevent the spread of falsehoods or the sale of inappropriate products—an unethical, unacceptable, and potentially unlawful course of action from one of the nation's largest retailers").

Based on the totality of the circumstances, this Court will follow *R.C. Maxwell* and grant summary judgment in favor of McAleer.  The Court finds the facts here are more like those in *R.C. Maxwell*, which supports a finding of no state coercion.[9]

**C.    Newsmatics's Motion for Summary Judgment**

> ***1.    Plaintiff's First Amendment Claim (§ 1983 and the NJCRA) (Count I of Plaintiff's TAC)***

Newsmatics moves for summary judgment on Plaintiff's § 1983 and NJCRA claim for suppression of speech under the First Amendment on the basis that Newsmatics is a private corporation that cannot be held liable under § 1983.  (ECF No. 121-2 at 26.)

The First Amendment "prohibits only *governmental* abridgment of speech" and "does not prohibit *private* abridgment of speech."  *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019).  However, private conduct may be deemed state action when "(1) it results from the State's exercise of 'coercive power'; (2) when the State provides significant encouragement, either overt or covert;" or "(3) when a private actor operates as a willful participant in joint activity with the State or its agents," among other circumstances.  *See Downey v. Coalition Against Rape and Abuse, Inc.*, 143 F. Supp. 2d 423, 438 (D.N.J. May 2, 2001), *aff'd*, 142 F. App'x 645 (3d Cir. 2005).  Put differently, the state actors must have "exercised coercive power or [have] provided such significant encouragement, either overt or covert," that the private party's conduct "must in law be

---

[9]    McAleer also argues that summary judgment must be granted because the Eleventh Amendment bars suits against him in his official capacity.  However, the Court already addressed this issue in its August 15, 2022 Opinion.  (*See* ECF No. 34 at 15 n.5 ("It is not clear whether Plaintiff brings these claims against Mr. McAleer in his official or individual capacity.  To the extent they are brought in his official capacity, they are barred by sovereign immunity. . . .  Thus, the Court construes the [C]omplaint as suing Mr. McAleer in his individual capacity."  (citation omitted).)  Again, to the extent Plaintiff intended to name McAleer in his official capacity, that claim is barred by the Eleventh Amendment.  *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 (3d Cir. 2010).

deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *see also Downey*, 143 F. Supp. 2d at 438.

As explained above, McAleer neither exercised coercive power over Newsmatics nor significantly encouraged it to act when he emailed Newsmatics's publishing partner. As a result, the Court finds that Newsmatics cannot be held liable as a state actor. *See Rxeed LLC v. Caremark LLC*, Civ. No. 24-01111, 2025 WL 891280, at *4 (D.N.J. Mar. 20, 2025) (relying in part on *Bantam Books, Inc. v. Sullivan* in concluding that the State of New Jersey did not "significantly encourage[]" the pharmacy benefits manager for its Medicaid program to stop accepting the plaintiff's business); *see also Camp v. Currently Unknown & Unnamed City of Phila. Emps.*, Civ. No. 22-192, 2023 WL 4188563, at *6 (E.D. Pa. June 26, 2023) ("A state actor suggesting that a security guard should remove someone from a facility does not in itself rise to the level of the state 'exercis[ing] coercive power' or providing 'significant encouragement' such that the security guard's actions can be attributable to the state."). Accordingly, the Court grants summary judgment in favor of Newsmatics on Plaintiff's First Amendment claim under § 1983 and the NJCRA.

### 2. Plaintiff's Breach of Contract Claim (Count II of Plaintiff's TAC)

Newsmatics claims that it is entitled to summary judgment on Plaintiff's breach of contract[10] claim because the Communications Decency Act, 47 U.S.C. § 230, provides it immunity for the retraction of Plaintiff's press release. Section 230 provides in pertinent part that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Thus,

---

[10]    Plaintiff contends that its breach of contract claim arises because it is "a paying account holder of Defendant Newsmatics" and therefore "Defendant was contracted to publish [P]laintiff's press release upon [D]efendant's approval of its contents and meeting [D]efendant's editorial and publishing guidelines." (ECF No. 108 at 13.)

to assert the affirmative defense of § 230 immunity, a defendant must establish three elements: (1) the defendant is an interactive computer service provider (ICS)[11]; (2) the plaintiff seeks to treat the defendant as a publisher or speaker of information; and (3) that information is provided by another content provider.  *See Green v. Am. Online (AOL)*, 318 F.3d 465, 470 (3d Cir. 2003).  Here, the parties do not dispute that Newsmatics is an ICS, (*see* ECF No. 122-2 ¶¶ 1-4; ECF No. 122 at 14), so the Court focuses on the second and third elements, taking them in reverse order.

> a.    *Another Content Provider*

Plaintiff disputes that this case involves "another content provider," (*see* ECF No. 122 at 12), but that argument is unavailing.  The relevant question is not whether the content derived from someone other than Plaintiff, but someone other than Newsmatics.  *See Anderson v. TikTok, Inc.*, 116 F.4th 180, 183 (3d Cir. 2024) ("In other words, ICSs are immunized only if they are sued for someone else's expressive activity or content (i.e., third-party speech), but they are not immunized if they are sued for their own expressive activity or content (i.e., first-party speech)"); *Green*, 318 F.3d at 470 ("There is no dispute that AOL is an interactive computer service as defined in 47 U.S.C. § 230(f) or that the relevant content originated not from AOL but from "another information content provider."); *see also Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."); *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1119 (N.D. Cal. 2020) ("[The] information for which the [p]laintiffs seek to hold Facebook liable was information solely

---

[11]    An ICS includes "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server."  47 U.S.C. § 230(f)(2).

provided by [the plaintiffs].  As a result, Facebook satisfies the [third] element necessary to claim [s]ection 230 immunity.").

There is no dispute that the press releases were drafted and prepared by Plaintiff and not Newsmatics.  And there is nothing in the record to suggest that Newsmatics imparted its own expression into Plaintiff's press releases.  *Cf. US Dominion, Inc. v. Byrne*, 600 F. Supp. 3d 24, 36 (D.D.C. 2022) ("While § 230 may provide immunity for someone who merely shares a link on Twitter . . . it does not immunize someone for making additional remarks that are allegedly defamatory[.]") (internal citations omitted); *Roland v. Letgo, Inc.*, Civ. No. 22-1456, 2024 WL 372218, at *7 (10th Cir. Feb. 1, 2024) (while not reaching the issue, noting that the district court found that an entity hosting an online marketplace was not immune under Section 230 because it placed a verification badge on a user's profile).

Therefore, the outcome here turns on the second element (*i.e.*, whether Plaintiff is seeking to hold Newsmatics liable as a "speaker or publisher" for retracting his press release).

### b.    *Speaker or Publisher of Information*

Newsmatics argued at the motion-to-dismiss stage that online press distributors have the editorial discretion to choose what content to publish and not to publish.  (ECF No. 12 at 2-3.)  In so arguing, Newsmatics relied on *Green*, 318 F.3d at 472, where the Third Circuit held that § 230 "bars lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone, or alter content." *Id.* at 471.  In denying Newsmatics's Motion to Dismiss on that basis, the Court found that "[a]ssuming Plaintiff demonstrates state action on the part of [Newsmatics], the decision to retract a press-release is distinguishable from a private publisher's right to select its publications, and it is subject to constitutional free speech guarantees."  (ECF No. 25 at 9.)

Plaintiff asserts that Newsmatics cannot claim § 230 immunity because state action caused it to remove the press release. It writes that "Newsmatics is not raising a Section 230 defense because it [is] in need of protection from a reader who is trying to hold it responsible for content it did not create. Rather, it is seeking protection for acting as an arm of the State by removing content the State disagreed with." (ECF No. 122 at 14.) But as noted above, Plaintiff's argument that Newsmatics acted as an arm of the state is unavailing.

Plaintiff also relies on *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009) for the proposition that § 230 "does not apply to breach of contract claims." (ECF No. 122 at 7-8.) But Plaintiff overstates the holding in *Barnes*. There, the plaintiff alleged that Yahoo "promised" to remove "indecent" profiles of her from its website, but ultimately failed to do so. *Barnes*, 570 F.3d at 1099. The court found that § 230 was not a bar to the plaintiff's promissory estoppel claim. *Id.* at 1109. While acknowledging that removing third party content is "quintessential publisher conduct," and that § 230 sets a baseline rule of immunity for such conduct, the court nevertheless found that "Yahoo made a promise with the constructive intent that it be enforceable, it has implicitly agreed to an alteration in such baseline." *Id.* at 1108-09. Unlike in *Barnes*, Plaintiff has identified no such promise that would lead this Court to conclude that § 230 immunity does not apply.

Indeed, courts have consistently held that § 230(c)(1) bars breach of contract claims, including those related to the removal of content. *See, e.g.*, *Yuksel v. Twitter, Inc.*, 2022 WL 16748612, at *5 (N.D. Cal. Nov. 7, 2022) ("By its terms, Section 230 does not provide any exception for contract claims. . . . And courts routinely hold that Section 230 immunizes platforms from contract claims, where, as here, they seek to impose liability for protected publishing activity"); *Haywood v. Amazon.com, Inc.*, 2023 WL 4585362, at *10 (W.D. Wash. July 18, 2023)

("[S]ection 230(c)(1) immunizes interactive computer service providers' decisions to both publish content or remove content."); *Rangel v. Dorsey*, 2022 WL 2820107, at \*3 (N.D. Cal. July 19, 2022) (finding § 230(c)(1) immunity applied where the plaintiff sought to treat the defendant "as the publisher because his claims derive[d] entirely from [the defendant's] decision to exclude his content and suspend his account—that is, traditional publishing functions."); *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 27 (Cal. Ct. App. 2021) ("Courts have routinely rejected a wide variety of civil claims like [the plaintiff's breach of contract claim] that seek to hold interactive computer services liable for removing . . . content . . . on the grounds they are barred by" § 230); *Jane Doe One v. Oliver*, 755 A.2d 1000, 1004 (Conn. Super. Ct. 2000), *aff'd*, 792 A.2d 911 (Conn. 2002) (dismissing breach of contract claim for failure to state a claim based on § 230 immunity).

The Court's conclusion that Plaintiff's breach of contract claim is barred under § 230 is consistent with the broad immunity publishers enjoy under § 230. *See Force v. Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019) ("The courts' generally broad construction of Section 230(c)(1) in favor of immunity has resulted in a capacious conception of what it means to treat a website operator as the publisher . . . of information provided by a third party." (internal quotation marks and citation omitted)); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) ("The majority of federal circuits have interpreted [§ 230] to establish broad "federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service."); *Chicago Lawyers' Comm. For C.R. Under The L., Inc. v. Craigslist, Inc.*, 461 F. Supp. 2d 681, 690 n.7 (N.D. Ill. 2006) (noting that "courts have treated § 230(c) immunity as quite robust" and collecting cases) (citation omitted); *see also Anderson*, 116 F.4th at 191.

The law is clear that § 230 "precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). As a result, Plaintiff cannot succeed on its breach of contract claim regarding the removal of its press release. *See Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.").[12]

Accordingly, Newsmatics's Motion for Summary Judgment on Count II of the TAC is granted.[13]

### 3.    *Newsmatics's Counterclaims*

Newsmatics also seeks summary judgment on its counterclaims for breach of contract and indemnity. Since a genuine dispute of material fact remains as to Newsmatics's breach of contract

---

[12]    Newsmatics also argues that it is immune from liability under § 230(c)(2), which provides immunity in "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." *See* 47 U.S.C. § 230(c)(2). In its brief in support of its Motion for Summary Judgment, however, Newsmatics does not explain how the press release at issue is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." (ECF No. 121-2 at 22-23.) In its reply brief, Newsmatics argues that the conduct "was objectionable because it resulted in a complaint by a channel partner," but it cites no authority in support of that proposition. (ECF No. 125 at 12.) Since the Court finds that Newsmatics is immune under § 230(c)(1), the Court does not reach the issue of § 230(c)(2) immunity.

[13]    Having found that Newsmatics is immune from Plaintiff's breach of contract claim under § 230, the Court does not reach Newsmatics's argument that Plaintiff has failed to show damages, as required to sustain its breach of contract claim.

claim, the Court declines to grant summary judgment in favor of Newsmatics.  Newsmatics's

Motion is also denied as to its indemnification claim.

> a.  *Breach of Contract (Counterclaim I of Newsmatics's Third Amended Answer)*

In support of its breach of contract claim, Newsmatics asserts that Plaintiff "agreed to

Newsmatics's Terms of Service, User Agreement, and Editorial Guidelines when it established

service with Newsmatics" and thereafter violated those policies by submitting its non-complying

press releases for publication.[14]  (ECF No. 121-2 at 36.)  According to Newsmatics, its guidelines

state that "[Newsmatics] only accepts press releases from law firms in which the firm is

representing one of the parties in the case.  [Newsmatics] does not accept press releases regarding

legal cases from third-party firms."  (ECF No. 121-3 ¶ 35.)  But in opposition, Plaintiff notes that

after submitting a prior press release for publication, which was similar to the February 20 press

---

[14]    The terms of service contain a Maryland choice-of-law clause.  (*See* ECF No. 121-6 at 133).  However, Newsmatics relies solely on New Jersey law in moving for summary judgment on its counterclaims for breach of contract, indemnity and common law fraud.  (ECF No. 121 at 36-42.)  In opposing summary judgment as to Newsmatics's counterclaims, Plaintiff cites only one United States Supreme Court case, but it does not dispute that New Jersey law applies.  (*See* ECF No. 122 at 17-20.)  Based on the parties' briefing, the Court will also apply New Jersey law.  *See Standard Reg. Co. v. Keala*, Civ. No. 14-00291, 2014 WL 3420785, at *4 (D. Haw. July 11, 2014) ("Although each agreement includes a provision stating that Ohio law applies, the parties agree that Hawaii law applies given the parties' contacts in Hawaii and Hawai's interest in the issues raised."); *Chemtrust Indus. v. Share Corp.*, Civ. No. 82-1224, 1987 WL 13822, at *4 (S.D. Tex. June 19, 1987) ("Although the contracts in question stipulate that Illinois law applies, the parties have agreed that Texas law applies."); *see also Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316 (3d Cir. 2014) (holding that the parties waived their right to object to the application of New Jersey law, reasoning that "[t]he parties did not litigate the choice-of-law question before the District Court" ); *Umano Med., Inc. v. Disorb Sys., Inc.*, Civ. No. 18-4338, 2020 WL 2512800, at *5 (E.D. Pa. May 15, 2020) ("In their briefing, the parties declined to invoke the choice of law provision, and I will therefore treat the provision as waived." (citing *Williams*, 765 F.3d at 316-17)).  *See also Curns v. Akins*, 669 S.W.3d 672, 676 (Mo. Ct. App. 2023) ("[T]he parties have waived the choice of law provision in the [a]greement through their conduct.  Neither party has cited to applicable Maryland law in their briefs, nor was Maryland law addressed in their motions before the trial court.  Further, neither party has addressed the choice of law provision in their briefing.").

release at issue, a Newsmatics representative reviewed the press release and sent Plaintiff the following message:

> Thank you for submitting your press release.  In general, we distribute press releases with legal content. However, we require full transparency.  You should use a company email address and full contact details.  Preferably, you should have your law firm contact details on the release.
>
> We need to avoid having to perform complicated due diligence or setting ourselves up for liability if the release is untrue.
>
> If the release is rejected, we will issue a refund.
>
> [(ECF No. 122-1 ¶ 18.)]

Plaintiff responded as follows: "We have resubmitted the press release with an email address of nj@chinese-community-center.org from our legal department.  We are responsible for the news release that we published.  We only disclose the facts and nothing else.  After all, whatever is published here is available in the public domain, and there is nothing hidden."  (*Id.* ¶ 19.) Newsmatics thereafter published the press release, writing to Plaintiff that the press release had been "approved and distributed." (*Id.* ¶ 20.)  Newsmatics asserts that Plaintiff misrepresented that the press releases came from Plaintiff's legal department as Plaintiff, a non-lawyer, wrote the press release at issue.  (*See* ECF No. 121-3 ¶¶ 44-47.)  Plaintiff, however, counters that "Jimmy Hwang never said he was a lawyer, never claimed a lawyer wrote the contents of the press release, and never claimed the legal department issued the press release.  Jimmy Hwang provided the email address to the New Jersey Chinese Community Center as requested. . . ."  (ECF No. 122 at 19.)

Based on the apparent conflict between Newsmatics's guidelines and how it operated (*i.e.*, approving content about legal matters without any representation that such content was authored by a law firm), the Court finds that Plaintiff has raised a genuine dispute of material fact to avoid summary judgment.  Although Newsmatics argues that Plaintiff breached its terms of service, its

own approval and publication of Plaintiff's press releases creates an issue of fact that should be decided by a jury.

> b.    Indemnity (Counterclaim II of Newsmatics's Third Amended Answer)

Newsmatics asserts that summary judgment must be granted on its indemnity claim because "[w]hen Mr. Hwang subscribed to Newsmatics' services he (and [Plaintiff] per Newsmatics' terms of service) agreed to indemnify Newsmatics" for various costs.    The indemnification clause in Newsmatics's terms of service states as follows:

> If you are using our Services on behalf of a business, that business accepts these terms. It will hold harmless and indemnify EIN Presswire and its affiliates, officers, agents, and employees from any claim, suit or action arising from or related to the use of the Services or violation of these terms, including any liability or expense arising from claims, losses, damages, suits, judgments, litigation costs, and attorneys' fees.

> [(ECF No. 121-6 at 133.)]

Newsmatics claims that Plaintiff breached Newsmatics's policies by submitting press releases that did not meet Newsmatics's standards for legal press releases.  (*See* ECF No. 121-2 at 30.)  Since Plaintiff filed this action related to the removal of the purportedly non-conforming press release, Newsmatics asserts that Plaintiff must indemnify it for the costs incurred in defending against this "baseless suit."  (*Id.* at 40.)

In its opposition brief, Plaintiff argues that the counterclaim must be "dismissed" for two reasons.  First, Plaintiff argues that "this action does not arise from the use of Newsmatics' services, but from Newsmatics' retraction of the plaintiff's press release."  (ECF No. 122 at 20.)  Plaintiff does not cite any cases in support of this theory, nor does it explain in any further detail how the retraction of the press release is unrelated to the use of Newsmatics's services.  Thus, the Court is unpersuaded by this argument.  Second, Plaintiff argues that the indemnity claim must be

38

dismissed because Newsmatics cannot "recover for [its] own negligence" and because the indemnity provision is only intended to protect from suits by third parties.  (*Id.*)

As Plaintiff's claims against McAleer and Newsmatics have now been dismissed, Newsmatics's indemnification claim would seek to recover its attorneys' fees and costs against Plaintiff.  (*See* ECF No. 125 at 15 ("Newsmatics has expended several hundred thousand dollars and hundreds of hours in legal and corporate time defending claims unrelated to any fact and for which it is immune.").)

Generally, New Jersey follows the "American Rule," which "prohibits recovery of counsel fees by the prevailing party against the losing party."  *In re Est. of Vayda*, 875 A.2d 925, 928 (N.J. 2005) (citation and quotation marks omitted).   But "a prevailing party can recover [attorneys'] fees if they are expressly provided for by statute, court rule, or contract."  *CEM Bus. Sols., Inc.*, 2022 WL 1017098, at *2 (quoting *Packard-Bamberger & Co., Inc. v. Collier*, 771 A.2d 1194, 1202 (N.J. 2001)).  "Indemnity agreements are interpreted in accordance with the rules governing the construction of contracts generally."  *Vitty v. D.C.P. Corp.*, 633 A.2d 1040, 1042 (N.J. Super. Ct. App. Div. 1993).

As for Plaintiff's argument that the indemnification clause only applies to claims by third parties, it is true that "[g]enerally, a claim for indemnification is based on an indemnitee's claim to recover from the indemnitor for the indemnitee's liability to a third party."  *CEM Bus. Sols., Inc.*, 2022 WL 1017098, at *2.  However, the New Jersey Supreme Court recently explained in *Boyle v. Huff*, that "first-party" indemnification may be appropriate in certain circumstances: "We [] decline to endorse the [] bright-line rule that indemnification applies only to third-party claims. Parties are free to determine whether to extend indemnification provisions to first-party actions or limit them solely to third-party actions."  314 A.3d 793, 802 (N.J. 2024).

In *Boyle*, the Court considered whether a trustee of a condominium association's board was entitled to attorneys' fees in his suit against the association under a provision that required the association to indemnify him "against all loss, costs and expenses, including counsel fees, reasonably incurred by him in connection with any action, suit, or proceeding to which he may be a party by reason of his being or having been a [t]rustee or officer" of the association. *Id.* at 799. The Court held that it was "*not* axiomatic that indemnification is limited only to third-party claims," and that "indemnification may also apply to first-party claims if that is the clear intent of the parties as expressed by their deliberate word choices when drafting contracts." *Id.* at 801. The Court found, however, that the plaintiff's indemnification claim failed because, when read as a whole, the indemnification clause covered only claims brought by unit owners against trustees, and not a first-party claim brought by a trustee. *Id.* at 800. The Court reasoned that "express language" is required to support a first-party indemnification claim. *Id.* at 801. To hold otherwise, the Court explained, would be inconsistent with the presumption underlying the American Rule that "parties will each pay their own way" absent some "affirmative indicia of the intent to contract otherwise. *Id.*

Here, the indemnity provision in Newsmatics's terms of service is silent as to first-party claims. (ECF No. 121-6 at 123.) As a result, following the New Jersey Supreme Court's guidance in *Boyle*, Newsmatics's first-party indemnity claim fails as a matter of law. *See id.* at 802 ("[W]e encourage parties seeking to permit indemnification of first-party claims to include express language to do so. Otherwise, any ambiguity will continue to be construed against the indemnitee."). *Cf. i5 Tech Inc. v. Prudent Partners LLC*, No. A-1001-23, 2025 WL 1000397, at *5 (N.J. Super. Ct. App. Div. Apr. 2, 2025) (affirming award of attorneys' fees on a first-party indemnification claim, and distinguishing the case from *Boyle*, where the parties' contract included

an indemnification clause providing that "[e]ach party shall defend, indemnify and hold harmless the other party against any and all losses and damages arising out of any misrepresentation or breach *by the other party*") (emphasis added).  This is particularly true in this case, where Newsmatics seeks attorneys' fees because "there must be affirmative indicia of the intent to indemnify to overcome the presumption that parties will each pay their own way," and no such indication exists here.  *Boyle*, 314 A.3d at 801.

For these reasons, Newsmatics has not shown that it can succeed as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Booth v. Drissell*, Civ. No. 23-3004, 2024 WL 3811624, at *2 (3d Cir. Aug. 14, 2024).  Accordingly, Newsmatics's Motion for Summary Judgment as to its indemnity counterclaim is denied.[15]

### D.    Newsmatics's Motion for Sanctions

Although Rule 11 is intended to discourage the filing of frivolous, unsupported, or unreasonable claims, "sanctions are warranted only in the exceptional circumstances where a claim or motion is patently unmeritorious or frivolous." *Paris v. Pennsauken Sch. Dist.*, Civ. No. 12-7355, 2013 WL 4047638, at *6 (D.N.J. Aug. 9, 2013) (quoting *Goldenberg v. Indel, Inc.*, Civ. No. 09-5202, 2011 WL 1134454, at *2 (D.N.J. Mar. 25, 2011)).  Newsmatics asserts that sanctions should be granted on two bases.  First, it contends that Plaintiff "refused to dismiss this action" despite caselaw indicating that Newsmatics was immune from suit under § 230.  (ECF No. 103-1 at 4.)  Second, it asserts that Plaintiff had no factual basis to bring this suit, arguing that Hwang, "made numerous statements against interest and admissions demonstrating that [Plaintiff] had no

---

[15]    Although Plaintiff argues in its opposition brief for dismissal of the counterclaim, "an opposition brief is not a proper vehicle for a request to dismiss a [] claim." *Carlos v. York Cnty.*, Civ. No. 15-01994, 2016 WL 1706163, at *7 (M.D. Pa. Apr. 27, 2016); *McCrary v. Stifel, Nicolaus & Co.*, Civ. No. 10-295, 2010 WL 2076094, at *1 (E.D. Mo. May 21, 2010) ("A memorandum in opposition to a motion is not the proper vehicle for what amounts to a request to dismiss a plaintiff's claim.").

factual basis to bring this suit, that [Plaintiff] was aware of Newsmatics's terms of service and knowingly violated them, and otherwise confirmed that the allegations contained within its Complaint were false." (*Id.*) Newsmatics also argues that Plaintiff "had no real basis for the damage demand."

However, the Court finds that this case does not present an exceptional circumstance warranting Rule 11 sanctions. Though the Court concluded above that § 230 shields Newsmatics from liability in this case, it does not find that Plaintiff's argument to the contrary was patently frivolous. Plaintiff supported its argument with caselaw that the Court simply found distinguishable.

The Court also finds Newsmatics second argument in support of awarding sanctions unavailing. As discussed above, there is a material dispute as to whether Plaintiff violated Newsmatics's terms of service, particularly considering that at least one of its press releases was reviewed and approved by a Newsmatics employee. And while the damages asserted by Plaintiff are speculative and subject to attack on the merits, the Court is unconvinced on the record before it that they were wholly without basis and warranting the severe consequence of Rule 11 sanctions. Indeed, Hwang testified under oath that the press release at issue was part of a fundraising strategy employed by Plaintiff. (ECF No. 122-6 at 82-85, 70:19-73:21.) Furthermore, Hwang testified that Plaintiff saw an increase in donations after issuing the December press releases, (ECF No. 122 at 24), and that he expected to drum up $250,000 from the campaign by holding events over the next two years, (ECF No. 122-6 at 95, 81:13-22; 107-08, 92:16-93:4).

Accordingly, Newsmatics's Motion for Sanctions is denied.

IV.    **CONCLUSION**

For the foregoing reasons, and other good cause shown, McAleer's Motion for Summary Judgment is **GRANTED**. Newsmatics's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**. The Court dismisses Plaintiff's claims against Newsmatics. The Court declines to grant summary judgment in favor of Newsmatics on its breach of contract and indemnity counterclaims. The Court **STRIKES** Count III of Plaintiff's TAC and Count III of Newsmatics's Third Amended Answer. Newsmatics's Motion for Sanctions is **DENIED**. An appropriate Order follows.

Dated: June 3, 2025

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE